49 A.3d 415

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. KIRBY LENIHAN, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued March 6, 2012—Decided August 13, 2012.

500

Before Judges MESSANO, KENNEDY and GUADAGNO.

*Gary A. Kraemer* argued the cause for appellant (*Daggett, Kraemer, Kovach & Gjelsvik,* attorneys; *Mr. Kraemer,* on the brief).

*Gregory R. Mueller,* First Assistant Prosecutor, argued the cause for respondent (*David J. Weaver,* Sussex County Prosecutor, attorney; *Mr. Mueller,* of counsel and on the brief).

The opinion of the court was delivered by

GUADAGNO, P.J.F.P. (temporarily assigned).

In this case we are asked to determine whether a violation of *N.J.S.A.* 39:3–76.2f, the "seat belt law," can serve as a predicate offense to support a conviction under *N.J.S.A.* 2C:40–18(b), which proscribes knowingly violating a law or failing to perform a duty imposed by law intended to protect the public health and safety and recklessly causing serious bodily injury. Defendant appeals her plea-bargained conviction under *N.J.S.A.* 2C:40–18(b), arguing the law is unconstitutionally vague and the seat belt law is not a law intended to protect the public health and safety as contemplated by this statute. We reject both arguments and affirm.

I.

We discern the following facts from the record. At approximately 12:39 a.m. on Friday, August 10, 2007, the eighteen-year-old defendant was driving her 1999 Hyundai southbound on Route 519 in Hampton Township, with her sixteen-year-old friend, K.G., in the front passenger seat. Defendant lost control of the vehicle and it veered to the right, crossing the shoulder of the road, striking the guardrail head-on. Both defendant and K.G. were seriously injured and transported to a local hospital. K.G. died the following day.

Police officers investigating the scene determined that neither occupant of the car was wearing a seat belt at the time of the accident. They also found a can of aerosol dust remover and a can of carpet deodorizer on the driver's side floor of the vehicle. The can of carpet deodorizer was missing the lid and nozzle.

Suspecting that the occupants in the car might have been inhaling or "huffing" the propellants in these cans to get high, the

police requested that a blood sample be taken from defendant. Approximately forty-five minutes after the accident, defendant's blood was drawn at the hospital and laboratory analysis later revealed that her blood sample contained a concentration of 1,1–Difluoroethane, a chemical compound that was also found in the can of dust remover.

On August 13, 2007, defendant was issued summonses charging her with her own, and K.G.'s failure to wear a seatbelt, *N.J.S.A.* 39:3–76.2f; driving under influence, *N.J.S.A.* 39:4–50a; [1] and reckless driving, *N.J.S.A.* 39:4–96. On October 17, 2007, defendant was charged in a complaint with causing the death of K.G. by driving recklessly, while under the influence of an inhalant within 1000 feet of school property, *N.J.S.A.* 2C:11–5(b)(3)(a).

On February 24, 2009, a Sussex County grand jury returned a three-count indictment charging defendant with second-degree violation of a public safety law and recklessly causing K.G.'s death, *N.J.S.A.* 2C:40–18(a) (count one); second-degree vehicular homicide, *N.J.S.A.* 2C:11–5a (count two); and first-degree vehicular homicide within 1,000 feet of school property, *N.J.S.A.* 2C:11–5(b)(3)(a) (count three). Under count one, the predicate public safety law defendant was charged with violating was *N.J.S.A.* 39:3–76.2f, the "seat belt law."

Defendant thereafter moved to dismiss the indictment. With respect to count one, defendant argued that the seat belt law was not a law intended to protect the public health and safety within the meaning of *N.J.S.A.* 2C:40–18. On October 19, 2010, the trial court denied defendant's motion as to counts one and two of the indictment, and the State consented to the dismissal of count three.

On February 28, 2011, pursuant to a plea agreement, the State agreed to amend count one, reducing the charge from a second to a third-degree crime. Instead of causing K.G.'s death, the re-

---

[1] *N.J.S.A.* 39:4–50a has since been recodified as *N.J.S.A.* 39:4–50.22.

duced charge alleged defendant recklessly caused her serious bodily injury. *N.J.S.A.* 2C:40–18(b). Count two of the indictment and the charge of operating a motor vehicle while under the influence were dismissed, and the other pending charge of reckless driving was merged with the amended charge in count one. The plea agreement reserved defendant's right to appeal the trial court's denial of her motion to dismiss count one of the indictment on the ground that *N.J.S.A.* 39:3–76.2f cannot serve as a predicate offense under *N.J.S.A.* 2C:40–18.

The defendant entered a guilty plea to the amended charge, but claimed, as a result of injuries suffered in the crash, she had no specific recollection of the crash or the events leading up to the crash. Her plea allocution was apparently based on her review of the record including police reports.

On May 19, 2011, defendant was sentenced to three years probation and 180 days imprisonment with credit for eight days of jail time served. We granted defendant's application for a stay on May 25, 2011. On appeal, defendant raises the following issues for our consideration:

POINT I

THE TRIAL COURT'S DETERMINATION THAT *N.J.S.A.* 39:3–76.2f IS A PROPER PREDICATE OFFENSE TO SUPPORT A CONVICTION FOR *N.J.S.A.* 2C:40–18 IS NOT ENTITLED TO ANY SPECIAL DEFERENCE BY THE APPELLATE DIVISION.

POINT II

COUNT 1 OF THE INDICTMENT CANNOT SUPPORT DEFENDANT'S CONVICTION, AS THE GENERAL REFERENCE IN *N.J.S.A.* 2C:40–18(b) TO "PUBLIC HEALTH AND SAFETY" DOES NOT APPLY TO A DISCRETE INDIVIDUAL'S FAILURE TO WEAR A SEAT BELT WITHIN A PRIVATE VEHICLE.

In her reply brief, defendant raised this additional argument:

THE STATUTE *N.J.S.A.* 2C:40–18 IS UNCONSTITUTIONALLY VAGUE AND THEREFORE VOID AND UNENFORCEABLE.[2]

---

[2] *Rule* 2:6–5 precludes the use of a reply brief to add issues not previously raised in the formal brief. *See State v. Smith,* 55 *N.J.* 476, 488, 262 *A.2d* 868 (1970). As this issue is a matter of first impression, we will consider the additional point even though it was not properly presented.

## II.

### A.

We agree that the "trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan,* 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995). Therefore, our review of defendant's constitutional challenge to *N.J.S.A.* 2C:40–18(b), and her claim that the law was improperly applied to her is plenary. *See State v. Goodman,* 415 *N.J.Super.* 210, 225, 1 *A.*3d 767 (App.Div.2010), *certif. denied,* 205 *N.J.* 78, 12 *A.*3d 210 (2011). We also agree that criminal statutes must be "strictly construed." *State v. Hodde,* 181 *N.J.* 375, 379, 858 *A.*2d 1126 (2004).

### B.

For the reasons that follow, we reject defendant's argument that the seat belt law is not a law "intended to protect the public health and safety" as contemplated by *N.J.S.A.* 2C:40–18(b).

New Jersey has a long history of enacting laws intended to protect the public health and safety and our courts have reviewed and upheld many of these as necessary for that purpose. In 1906, for example, our Supreme Court affirmed the conviction of a defendant for violating an Atlantic City ordinance which prohibited anyone except the municipality's duly authorized contractor from using the streets to collect or dispose of garbage or refuse matter that might become dangerous to the public health. *Atl. City v. Abbott,* 73 *N.J.L.* 281, 282, 62 *A.* 999 (Sup.Ct.1906). In 1923, an ordinance regulating the hours of operation of barber shops was upheld on the grounds that the health hazards inherent in barber shops necessitated regulation of their hours of operation to protect the public health. *Falco v. Atl. City,* 99 *N.J.L.* 19, 122 *A.* 610 (Sup.Ct.1923).

A 1947 resolution requiring vaccination of school children as a prerequisite to their admission to a borough's public schools was

upheld as a proper exercise of the police power for the protection of the public welfare. *Sadlock v. Bd. of Educ.*, 137 *N.J.L.* 85, 91, 58 *A.*2d 218 (Sup.Ct.1948). In *Sadlock,* the Court relied on *Jacobson v. Mass.*, 197 *U.S.* 11, 25 *S.Ct.* 358, 49 *L.Ed.* 643 (1905), which held that a statute requiring compulsory vaccination against the spread of smallpox was a proper exercise of the legislative prerogative to protect the public health, finding "the police power of a state must be held to embrace, at least, such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety." *Id.* at 88.

In *Burton v. Sills,* 53 *N.J.* 86, 248 *A.*2d 521 (1968), *appeal dismissed,* 394 *U.S.* 812, 89 *S.Ct.* 1486, 22 *L.Ed.*2d 748 (1969), the Court rejected a constitutional challenge to the State's Gun Control Law enacted in 1966, holding that the State's police power authorizes the Legislature to regulate firearms. *Id.* at 102, 248 *A.*2d 521. *N.J.S.A.* 2C:58–3(c)(5) prohibits the issuance of a firearms purchaser identification card to "any person where the issuance would not be in the interest of the public health, safety or welfare." We have consistently applied a broad definition to this term in upholding denial of firearms permits. *See, e.g., State v. Freysinger,* 311 *N.J.Super.* 509, 513–17, 710 *A.*2d 582 (App.Div.1998)(permit denied for habitual drunkenness); *In re Sbitani,* 216 *N.J.Super.* 75, 78, 522 *A.*2d 1041 (App.Div.1987) (denial on basis of conviction of certain disorderly persons offenses); *State v. Cunningham,* 186 *N.J.Super.* 502, 507, 453 *A.*2d 239 (App.Div.1982) (permit denied for intentional wrongdoing or negligence in the handling of a weapon).

Not all laws addressing public health and safety have been upheld, however. In *Fasino v. Mayor & Members of Borough Council,* 122 *N.J.Super.* 304, 300 *A.*2d 195 (Law Div.1973), for example, an ordinance requiring all businesses to close from 11 p.m. to 6:30 a.m. was struck down as an invalid exercise of the police power because there was no substantial relationship to the public health, safety, morals, or general welfare. *Id.* at 318, 300 *A.*2d 195.

Against this backdrop, we consider whether the seat belt law can be considered a law designed to protect the public health and safety.

In an attempt to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents, Congress passed the National Traffic and Motor Vehicle Safety Act of 1966, 80 *Stat.* 718, 15 *U.S.C.A.* §§ 1381 to 1431 (recodified without substantive change at 49 *U.S.C.A.* §§ 30101 to 30170). This law led to the issuance in 1967 of Federal Motor Vehicle Safety Standard No. 208, which required automakers to install a lap belt for each occupant as well as a shoulder harness for the front occupants on all automobiles made after January 1968. *See* 32 *Fed.Reg.* 2415 (1967).

While such legislation required vehicles to be equipped with seatbelts, their use remained optional, and "[i]t became apparent ... that most occupants simply would not buckle up their belts." *Geier v. Am. Honda Motor Co.,* 529 *U.S.* 861, 875, 120 *S.Ct.* 1913, 1922, 146 *L.Ed.*2d 914, 928 (2000) (citing 34 *Fed.Reg.* 11148 (1969)). Surveys of seat belt usage were conducted for the National Highway Traffic Safety Administration (NHTSA) between 1978 and 1980, leading the agency to report that only 40% to 50% of the people were actually using belts at least some of the time. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 *U.S.* 29, 54 n. 19, 103 *S.Ct.* 2856, 2872 n. 19, 77 *L.Ed.*2d 443, 465 n. 19 (1983). "These surveys revealed that while 20% to 40% of the public was opposed to wearing [seat] belts, the larger proportion of the population [did] not wear belts because they forgot or found manual belts inconvenient or bothersome." *Id.* at 54 n. 18, 103 *S.Ct.* at 2872 n. 18, 77 *L.Ed.*2d at 465 n. 18.

This and other authoritative evidence convinced state and federal authorities that mandating seat belt use could prevent many deaths and injuries arising from automobile accidents. *See generally* Boris Tourin, *Ejection and Automobile Fatalities,* 73 Pub. Health Reports 381 (1958). A 1983 study by the federal government calculated that the use of seat belt systems by all automobile

occupants could reduce fatalities and serious injuries by one-half each year. United States Department of Transportation, National Highway Traffic Safety Administration, *Progress and Assessment Report on the National Safety Belt Usage Program* (Sept.1983). Shortly thereafter, the states began enacting mandatory seatbelt laws.

In 1984, New Jersey enacted the Passenger Automobile Seat Belt Usage Act, making the wearing of seat belts in passenger cars mandatory in New Jersey. *L.* 1984, *c.* 179 (codified at *N.J.S.A.* 39:3–76.2e to 76.2k). New Jersey was the second state in the nation, following New York, to pass a mandatory seat belt law. *See N.Y. Veh. & Traf. Law* § 1229–c (McKinney 2012). Currently, every state, with the exception of New Hampshire, has either primary or secondary seat belt laws.[3] Governors Highway Safety Ass'n., *Seat Belt Laws*, (August 2012), http://www.ghsa.org/html/_stateinfo/laws/seatbelt_laws.html.

The statement of the legislature that accompanied the New Jersey bill indicates that the intent of the legislature was to make seatbelt use mandatory:

1. There has been a "dramatic decrease in fatalities and serious injuries in countries and provinces having enacted mandatory seat belt usage law...."

2. "It is estimated that easily one-half of all fatalities and serious injuries can be eliminated by simply requiring people to use equipment already installed in their vehicles...."

3. Mandating such use would "greatly reduce lost work time, insurance cost and health benefit cost to both individuals, private companies, and the State of New Jersey."

4. Lastly, "[w]hile insurance rates in the State of New Jersey are among the highest in the country, the increased use of safety seat belt systems will cause subsequent reductions in accidents, deaths, injuries, and lost work time. This

---

[3] Primary seat belt laws allow law enforcement officers to ticket a driver or passenger for not wearing a seat belt, without any other traffic offense taking place. Secondary seat belt laws state that law enforcement officers may issue a ticket for not wearing a seat belt only when there is another citable traffic infraction. While New Hampshire has enacted neither a primary nor a secondary seat belt law for adults, the state does have a primary child passenger safety law that covers all drivers and passengers under 18. *Ibid.*

could lead to reduced cost to business and industry, and local and state governments thereby eventually leading to cost containment and other incentives in automotive insurance rates and premiums."

[*Waterson v. General Motors Corp.*, 111 *N.J.* 238, 261, 544 *A.*2d 357 (1988) (quoting Assembly Law, Public Safety and Defense Comm. Statement to Assembly, No. 2304, p. 3 (1984)).]

*N.J.S.A.* 39:3–76.2f is entitled "Seat belt usage requirements; driver's responsibility" and provides in pertinent part:

a.   [A]ll passengers who are at least eight years of age but less than 18 years of age, and each driver and front seat passenger of a passenger automobile operated on a street or highway in this State shall wear a properly adjusted and fastened safety seat belt system....

The driver of the vehicle is responsible for insuring that minor passengers are properly secured:

b.   The driver of a passenger automobile shall secure or cause to be secured in a properly adjusted and fastened safety seat belt system ... any passenger who is at least eight years of age but less than 18 years of age.

While it is clear that the seat belt law is intended to protect the public health and safety, defendant argues that the legislature did not envision that a violation of that law could serve as the basis for prosecution under *N.J.S.A.* 2C:40–18(b). In support of this argument, defendant relies on commentary in *New Jersey Practice* suggesting that the law would apply to "an architect who knowingly constructs a building in violation of a building code and an occupant is killed when the building collapses." 33A, New Jersey Practice, Criminal Law § 35.6(A) at 310–311 (Gerald D. Miller) (4th ed.2005). Defendant argues that this example illustrates that the focus of *N.J.S.A.* 2C:40–18 is the "general public at large" while the seatbelt law imposes a statutory obligation upon a driver to see that a "discrete, individual, specifically identified passenger is seat-belted."

*N.J.S.A.* 2C:40–18(b) provides:

A person is guilty of a crime of the third degree if the person knowingly violates a law intended to protect the public health and safety or knowingly fails to perform a duty imposed by a law intended to protect the public health and safety and recklessly causes serious bodily injury.

Notably, the statute does not define the term "a law intended to protect the public health and safety," and there are no reported cases addressing the statute.

"When construing a statute, our goal is to discern and effectuate the Legislature's intent." *State v. Brannon*, 178 *N.J.* 500, 505, 842 *A.*2d 148 (2004). "The starting point for that inquiry is the language of the statute itself." *Ibid.* When a "statute is clear and unambiguous on its face and admits of only one interpretation, we need delve no deeper than the act's literal terms to divine the Legislature's intent." *State v. Butler*, 89 *N.J.* 220, 226, 445 *A.*2d 399 (1982).

Defendant concedes that the law requiring automobile manufacturers to equip their new vehicles with seat belts does fall under *N.J.S.A.* 2C:40–18, as a manufacturer who offered cars for sale without seat belts "would be an appropriate target of this statute." However, defendant argues that the State's use of the seatbelt law as a predicate offense to support a prosecution under *N.J.S.A.* 2C:40–18 is an "improper expansion" of the statute.

In the absence of a clear indication from the Legislature that it intended the phrase "law intended to protect the public health and safety" to have a special definition, we presume that the phrase carries its "ordinary and well-understood meaning[ ]." *State v. Afanador*, 134 *N.J.* 162, 171, 631 *A.*2d 946 (1993). We see no indication from the plain language of the statutes that the Legislature intended to apply the limitations suggested by defendant to either *N.J.S.A.* 2C:40–18 or the seat belt law.

Our Supreme Court has recognized that "the effectiveness of seat belts in reducing death and injury from automobile accidents cannot reasonably be disputed." *Waterson, supra*, 111 *N.J.* at 269, 544 *A.*2d 357. In *Waterson*, the Court took judicial notice of the efficacy of seat belts and quoted the Law Division opinion in *Dunn v. Durso*, 219 *N.J.Super.* 383, 394 n. 8, 530 *A.*2d 387 (Law Div.1986), for the proposition that "[p]roperly worn, seat belts may be the most significant source of automobile crash protection for

automobile occupants." *Waterson, supra,* 111 *N.J.* at 269–70, 544 *A.*2d 357 (internal quotation marks omitted).

Several states have found that seat belt laws are explicitly enacted to promote public safety. *People v. Kohrig,* 113 *Ill.*2d 384, 101 *Ill.Dec.* 650, 498 *N.E.*2d 1158 (1986); *State v. Hartog,* 440 *N.W.*2d 852 (Iowa 1989); *People v. Weber,* 129 *Misc.*2d 993, 494 *N.Y.S.*2d 960 (N.Y.1985); *State v. Swain,* 92 *N.C.App.* 240, 374 *S.E.*2d 173 (1988).

In considering a challenge to Ohio's mandatory seat belt law, the Ohio Court of Appeals considered and rejected an argument similar to that advanced by defendant, finding that Ohio's seatbelt law should be construed broadly as it affected a broad range of people:

> [T]he seat-belt law does not merely implicate the personal freedom and "rights" of the person choosing not to wear the belt, but also impacts the personal safety and welfare of other citizens, drivers, and pedestrians who are placed in harm's way by virtue of the appellant's choice not to wear his own safety belt.
>
> [*State v. Brown,* 2010–Ohio–4546 (Ohio Ct.App.2010), at ¶ 16, 2010 *WL* 3732298.]

In the present case, the trial court concluded that the purpose of the seatbelt law was clear:

> I believe this is a law, that the seatbelt law is enacted to protect the public. It's obvious. The public being individuals who are passengers in motor vehicle, who are minors, as passengers in motor vehicles. And the operator of the vehicle has a duty to insure that such an individual is properly wearing his seatbelt as that vehicle was being operated and moving over the roadways.

We agree. Clearly, *N.J.S.A.* 39:3–76.2f is a law addressed and enacted to protect the public health and safety. The language is clear and unambiguous and requires every driver and passenger in a vehicle operated in New Jersey to be secured with a seatbelt. Additionally, we do not find any express or implied limitations as to the type of public health and safety offense that can serve as a predicate violation under *N.J.S.A.* 2C:40–18.

### C.

Defendant also argues that *N.J.S.A.* 2C:40–18 is unconstitutionally vague and therefore void and unenforceable. We

note initially that a presumption of validity attaches to every statute. *State v. Muhammad,* 145 *N.J.* 23, 41, 678 *A.*2d 164 (1996). The party who challenges the constitutionality of a statute bears the burden of establishing its unconstitutionality. *State v. One 1990 Honda Accord,* 154 *N.J.* 373, 377, 712 *A.*2d 1148 (1998). The presumption of validity is "particularly daunting when a statute attempts to protect the public health, safety, or welfare." *In re C.V.S. Pharmacy Wayne,* 116 *N.J.* 490, 497, 561 *A.*2d 1160 (1989), *cert. denied,* 493 *U.S.* 1045, 110 *S.Ct.* 841, 107 *L.Ed.*2d 836 (1990). Such legislation has been consistently sustained if it " 'is not arbitrary, capricious, or unreasonable, and the means selected bear a rational relationship to the legislative objective.' " *Ibid.* (quoting *Brown v. City of Newark,* 113 *N.J.* 565, 572, 552 *A.*2d 125 (1989)). Our Supreme Court has held that "any act of the Legislature will not be ruled void unless its repugnancy to the Constitution is clear beyond a reasonable doubt." *Muhammad, supra,* 145 *N.J.* at 41, 678 *A.*2d 164.

█ Even where a statute's constitutionality is "fairly debatable, courts will uphold" the law. *Newark Superior Officers Ass'n v. City of Newark,* 98 *N.J.* 212, 227, 486 *A.*2d 305 (1985). We are obligated to construe a challenged statute to avoid constitutional defects if the statute is " 'reasonably susceptible' of such construction." *N.J. Bd. of Higher Educ. v. Bd. of Dirs. of Shelton Coll.,* 90 *N.J.* 470, 478, 448 *A.*2d 988 (1982) (quoting *State v. Profaci,* 56 *N.J.* 346, 350, 266 *A.*2d 579 (1970)).

█ The vagueness doctrine " 'is essentially a procedural due process concept grounded in notions of fair play.' " *State v. Lee,* 96 *N.J.* 156, 165, 475 *A.*2d 31 (1984) (quoting *State v. Lashinsky,* 81 *N.J.* 1, 17, 404 *A.*2d 1121 (1979)). The doctrine requires that " 'laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.' " *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 *U.S.* 489, 498, 102 *S.Ct.* 1186, 1193, 71 *L.Ed.*2d 362, 371 (1982) (quoting *Grayned v. City of Rockford,* 408 *U.S.* 104, 108, 92 *S.Ct.* 2294, 2298–99, 33 *L.Ed.*2d 222, 227 (1972)). "The

Legislature has considerable latitude in addressing criminal conduct. It can either prepare a detailed catalogue of proscribed activities or, within constitutional limits, address the problem more generally." *Lee, supra,* 96 *N.J.* at 166, 475 *A.*2d 31 (citing *Sanitary Vendors v. Byrne,* 40 *N.J.* 157, 166, 190 *A.*2d 876 (1963)).

Defendant argues that *N.J.S.A.* 2C:40–18 provides "no limits, or definable standards" in identifying a law intended to protect the public health or safety. As a result, the law can apply to "[v]irtually every provision of the Criminal Code in Title 2C." We addressed a similar challenge to the original stalking statute in *State v. Saunders,* 302 *N.J.Super.* 509, 695 *A.*2d 722 (App.Div.), *certif. denied,* 151 *N.J.* 470, 700 *A.*2d 881 (1997). There, we concluded that "[e]ven if behavior is not susceptible to precise definition, the statute may be constitutional." *Id.* at 521, 695 *A.*2d 722.

In *State v. Rogers,* 308 *N.J.Super.* 59, 705 *A.*2d 397 (App.Div. 1998), we addressed a constitutional challenge to the statute prohibiting the unauthorized practice of law, *N.J.S.A.* 2C:21–22b(2). The defendant in *Rogers* argued that the statute was unconstitutionally vague because it failed to define what constitutes the "practice of law." There, we concluded:

> [W]here the legislative regulatory objective is appropriate and the conduct intended to be prohibited is not fairly susceptible of definition in other than general language, there is no constitutional impediment to the use of such language. That there may be marginal cases in which it becomes difficult to determine the side of a line on which a particular fact situation falls is not a sufficient reason to hold the language too ambiguous to define a penal offense.
>
> [*Rogers, supra,* 308 *N.J.Super.* at 66, 705 *A.*2d 397 (internal citations omitted) (quoting *In re B.N.,* 99 *N.J.Super.* 30, 34, 238 *A.*2d 486 (App.Div.1968)).]

Defendant presents several hypothetical examples suggesting that violations of municipal ordinances that are arguably public health and safety laws could be elevated to more serious crimes through the application of *N.J.S.A.* 2C:40–18. In *Town Tobacconist v. Kimmelman,* 94 *N.J.* 85, 462 *A.*2d 573 (1983), the Supreme Court considered a challenge to the Drug Paraphernalia Act, *N.J.S.A.* 24:21–46 to –53, where similar hypothetical arguments were made. The Court upheld the law and rejected the specula-

tive positions holding "we know of no doctrine that requires a court to consider and determine the validity of every hypothetical application of legislation when a pre-enforcement vagueness attack is involved." *Id.* at 99, 462 *A.*2d 573 (citing *Hoffman Estates, supra,* 455 *U.S.* at 494–95, 102 *S.Ct.* 1186, 71 *L.Ed.*2d at 369). *In State v. Cameron,* 100 *N.J.* 586, 593, 498 *A.*2d 1217 (1985), the Court held that a "party may test a law for vagueness as applied only with respect to his or her particular conduct[.]"

Here, defendant concedes that she violated *N.J.S.A.* 39:3–76.2f(b), but argues that affirming her conviction would lead to abuses and "criminalize many forms of conduct that until now were commonly understood to carry minor, civil, or other non-criminal sanctions." We disagree. The lack of any reported decisions involving *N.J.S.A.* 2C:40–18 indicates that the law has been used sparingly, if at all, by prosecutors in the State. In addition, *N.J.S.A.* 2C:40–18 was enacted in 1997, thirteen years after the seatbelt law. We presume that the Legislature is fully aware of all existing laws when it enacts a new statute. *Brewer v. Porch,* 53 *N.J.* 167, 174, 249 *A.*2d 388 (1969).

Moreover, if the abuses predicted by defendant of "virtually unlimited new grounds for criminal prosecution," occur as a result of our ruling, it is the province of the legislature to revise or clarify the statute, not ours.

We accord the phrase, "a law intended to protect the public health and safety," its plain and ordinary meaning. If the Legislature had intended *N.J.S.A.* 2C:40–18 to be limited to the "community at large" and not apply to individuals, as suggested by defendant, it could have qualified the term accordingly. It did not do so. "Without such legislative direction, we are not free to superimpose on the ordinary meaning" of the phrase. *State v. Froland,* 193 *N.J.* 186, 196, 936 *A.*2d 947 (2007). We may supply terms omitted by the Legislature if it is clear that they are necessary to manifest the legislative intent. *Bd. of Chosen Freeholders of Morris v. State,* 159 *N.J.* 565, 576, 732 *A.*2d 1053 (1999). That is not the case here. The Legislature's use of the term, "a

law intended to protect the public health and safety" suggests an intent to reach a broad spectrum and their conscious choice not to employ restrictions and qualifications precludes us from supplying them here.

Legislatures are empowered to pass laws to meet the pressing social needs of the times, even if those laws seem to others ill-advised or later prove to be failures. Legislatures are entitled to experiment and explore means to advance public policy, provided there is a reasonable basis to support the legislation. *Williamson v. Lee Optical of Okla. Inc.*, 348 *U.S.* 483, 487–88, 75 *S.Ct.* 461, 464, 99 *L.Ed.* 563, 572 (1955) ("[T]he law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it."). *See also Day–Brite Lighting, Inc. v. Missouri*, 342 *U.S.* 421, 423, 72 *S.Ct.* 405, 407, 96 *L.Ed.* 469, 472 (1952).

Moreover, this is not an example of the "Prosecutor's arrogation of legislative power to his own authority" as suggested by defendant in her brief. Rather, as the trial court explained, the "[S]tate is giving the defendant [a] substantial break here by the plea bargain because they are prosecuting under the section of the statute for a third degree crime, not a second degree crime. So that is another benefit this defendant receives from the state by the terms of this plea bargain." At oral argument, the prosecutor who made the decision to charge *N.J.S.A.* 2C:40–18, explained that defendant was facing considerable jail time under the vehicular homicide charge as a result of the No Early Release Act, and the charge of the *N.J.S.A.* 2C:40–18 was included because of defendant's age and "mitigating circumstances." We find no support to defendant's claim that the prosecutor abused his discretion in bringing these charges.

Affirmed.